## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

ZOMAX, INC., JAMES T. ANDERSON,
MICHELLE BEDARD-ANDERSON, NEIL L.
DOLINSKY, THE JIM AND MIKKI
ANDERSON CHARITABLE REMAINDER
ANNUITY TRUST, JAMES E. FLAHERTY, and
ANTHONY ANGELINI,

Defendants

Case No.: 05-1128

Judge James M. Rosenbaum

Magistrate Judge Franklin
L. Noel

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"), alleges the following:

## SUMMARY

1.      This is a securities fraud case alleging false and misleading disclosures by

Zomax, Inc. ("Zomax") and certain of its senior executives concerning Zomax's projected

revenues and earnings for the third quarter of 2000, coupled with insider trading by James T.

Anderson ("Anderson") and his spouse Michelle "Mikki" Bedard-Anderson ("Bedard-

Anderson"), Zomax's co-founders.  Anderson and Bedard-Anderson sold their entire holdings of

Zomax stock in advance of the company's announcement of substantially lower-than-expected

revenues and earnings for the quarter, thereby avoiding losses in excess of $9 million, as the

price of the stock dropped sharply following the announcement.  At the time of their insider

trading, Anderson was the CEO and Chairman of the Board of Directors of Zomax, and Bedard-

1

Anderson was the company's Executive Vice-President of Sales and Marketing.  This action also charges Neil L. Dolinsky ("Dolinsky") with insider trading, alleging that Anderson, Dolinsky's friend and business associate, tipped him to sell his Zomax stock before the disappointing third quarter sales were disclosed to the public.

2.      As early as mid-July 2000, senior executives of Zomax knew or were reckless in not knowing, through confidential internal reports, that there was a strong possibility that Zomax was not going to meet projected third quarter revenue and earnings targets because of a decrease in European demand for its products and the material loss of business from a major customer. These senior executives included Anderson, Bedard-Anderson, James E. Flaherty ("Flaherty"), Chief Financial Officer ("CFO") of Zomax who knew or were reckless in not knowing, and Angelini ("Angelini"), President and Chief Operating Officer ("COO") of Zomax who was reckless in not knowing the above.

3.      Nevertheless, Anderson and Flaherty, in a conference call with analysts on July 24, 2000, represented that Zomax would meet its projected revenue target and analyst expectations for the third quarter and second half of the year.  Moreover, Zomax, Anderson and Flaherty failed to disclose information concerning the decrease in demand for Zomax's products and the material loss of business with a major customer in the conference call on July 24, 2000 and in Zomax's Form 10-Q for the second quarter of 2000 filed with the Commission on August 8, 2000.  Angelini was present for the conference call and remained silent despite Anderson's and Flaherty's misleading statements and omissions of material facts.  Angelini also permitted Zomax to file its Form 10-Q for the second quarter of 2000 without disclosing information concerning the decrease in demand for Zomax's products and the material loss of business with a major customer.

4.      At the beginning of August 2000, Anderson and Bedard-Anderson owned 821,250 shares of Zomax stock.  From August 4, 2000 through August 24, 2000, on the basis of material, nonpublic information concerning Zomax's lower-than-expected third quarter 2000 revenue and earnings, Anderson and Bedard-Anderson sold 356,250 shares of Zomax stock in open market transactions for prices ranging from $16.3125 to $18.50 per share.  As the third quarter financial outlook for Zomax continued to decline in late August 2000, Anderson and Bedard-Anderson arranged to sell off all of their remaining 465,000 shares of Zomax stock through The Jim and Mikki Anderson Charitable Remainder Trust (the "Trust"), which they created in order to avoid detection and scrutiny.  The Trust named Anderson and Bedard-Anderson as the sole beneficiaries of a sizeable annual annuity that is expected to deplete virtually the entire trust corpus during their lifetimes, pursuant to the terms of the Trust.  Shortly after creating the Trust, Anderson and Bedard-Anderson deposited their remaining 465,000 shares into the Trust, and the Trust promptly sold the shares, with the substantial assistance of Anderson, during a two week period ending September 20, 2000, for prices ranging from $16.375 to $19.625.  The total proceeds from the sales amounted to $8,406,425.32, and, under the terms of the Trust, Anderson and Bedard-Anderson, both under 50 years of age, have been receiving their annual annuity from the Trust of approximately $600,000 ever since.

5.      On, September 21, 2000, only one day after Anderson and Bedard-Anderson finished liquidating their shares through the Trust, Zomax, Inc. made its announcement of lower-than-expected actual earnings for the quarter.  As a result of this announcement, the price of the stock plummeted, falling by 52% to $8.31 per share on September 22 and declining even more that following Monday, September 25, to $6.84 per share, representing a 61% drop in share value.

6.      By liquidating their entire holdings in Zomax stock in advance of the public announcement by Zomax on September 21, 2000, Anderson and Bedard-Anderson avoided losses of $9,124,669.

7.      Anderson also tipped his friend Neil L. Dolinsky, who had solicited inside information from Anderson, to sell his shares of Zomax stock.  On September 8, 2000, Dolinsky sold 11,000 shares of Zomax stock and tipped his mother to do the same.  By selling Zomax in advance of the public announcement by Zomax on September 21, 2000, Dolinsky avoided losses of $135,380 and his mother avoided losses of $3,633, totaling $139,014 in losses avoided.

8.      As is alleged herein, Zomax has engaged in transactions, acts, practices, and courses of business which constitute and will constitute violations of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder, and Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§240.12b-20 and 240.13a-13] promulgated thereunder.

9.      As is alleged herein, Anderson has engaged in transactions, acts, practices, and courses of business which constitute and will constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder, Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rules 16a-3 and 16a-8(b)(3)(i) [17 C.F.R. §§ 240.16a-3 and 240.16a-8] promulgated thereunder, and aiding and abetting Zomax's violations of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§240.12b-20 and 240.13a-13] promulgated thereunder.

10.     As is alleged herein, Flaherty has engaged in transactions, acts, practices, and courses of business which constitute and will constitute violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder, and aiding and abetting Zomax's violations of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§240.12b-20 and 240.13a-13] promulgated thereunder.

11.     As is alleged herein, Angelini has engaged in transactions, acts, practices, and courses of business which constitute aiding and abetting Zomax's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] and Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§240.12b-20 and 240.13a-13] promulgated thereunder.

12.     As is alleged herein, Bedard-Anderson, Dolinsky and the Trust have engaged in transactions, acts, practices, and courses of business which constitute and will constitute violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

13.      By this action, the Commission seeks: (a) permanent injunctive relief against all defendants to prevent future violations of the federal securities laws; (b) disgorgement of ill-gotten gains plus prejudgment interest by all defendants; (c) civil penalties against all defendants; (d) an officer and director bar against defendants Anderson and Bedard-Anderson; and (e) such other equitable relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

14.    The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u and 78aa].  Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. §77v] and Section 27 of the Exchange Act [15 U.S.C. §78aa].

15.    In connection with the transactions, acts, practices and courses of business alleged in this Complaint, each of the Defendants, directly or indirectly, has made use of the means or instrumentalities of interstate commerce and of the mails.

16.    The transactions, acts, practices and courses of business constituting the violations herein have occurred within the jurisdiction of the United States District Court for the District of Minnesota and elsewhere.

## THE CORPORATE DEFENDANT

17.    Zomax, Inc. ("Zomax" or the "Company") is a Minnesota corporation founded in February 1996 with its headquarters in Plymouth, Minnesota.  Zomax is a manufacturer of CDs and DVDs, and provides software and related services to computer manufacturers and other producers of multimedia products.

18.    Zomax is a publicly-held company, whose common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. §78l(g)].  At all relevant times, Zomax's stock has been listed on the Nasdaq National Market.  The 2000 fiscal year for Zomax began on January 1, 2000 and ended on December 29, 2000.  For the fiscal year ended December 29, 2000, the Company's net sales were $239.1 million and net income was $24.9 million.

19.     At all relevant times, pursuant to Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and the rules and regulations promulgated thereunder, Zomax was required to file periodic reports with the Commission, including Forms 10-Q that were complete, accurate and not misleading.

20.     At all relevant times, Zomax had a practice of preparing each year a General Managers' Quarterly Plan ("GM Plan"), which was a confidential, nonpublic document circulated among certain senior management of Zomax.  The GM Plan was formulated prior to the beginning of each fiscal year of Zomax and reflected the target sales numbers that the general managers of Zomax expected to achieve every quarter for the coming year.  Defendants Anderson, Bedard-Anderson, Flaherty and Angelini received these GM Plans contemporaneous with their formation.

21.     At all relevant times, Zomax had a policy which prohibited all company directors, officers, general managers and certain key employees who possessed material, nonpublic information relating to Zomax from trading Zomax stock.  This policy also required that these individuals obtain pre-clearance of all transactions in Zomax stock from the Company's CFO and corporate counsel.  This policy further prohibited these individuals from disclosing material, nonpublic information about the Company to individuals outside the Company.  Zomax's insider trading policy also provided that these individuals could only trade Zomax's stock during certain "windows" of time.  Generally, those windows opened 24 hours following the release of earnings information and ended on the last trading day of the second month following the end of the quarter.

## THE INDIVIDUAL DEFENDANTS

22.      Defendant Anderson, age 48, is a resident of Fort Lauderdale, Florida.  Anderson and his wife, Bedard-Anderson, founded Zomax in February 1996.  Anderson was the CEO of Zomax from February 1996 through January 2004.  Anderson also served as the Chairman of the Board of Directors of Zomax from January 2000 through May 2004.

23.      Defendant Bedard-Anderson, age 46, is a resident of Fort Lauderdale, Florida. Bedard-Anderson was a co-founder of Zomax.  Bedard-Anderson was the Executive Vice-President of Sales and Marketing of Zomax from February 1996 through September 2002.

24.      Defendant Dolinsky, age 46, is a citizen of the United States of America and a resident of Leopold, Australia.  Dolinsky and Anderson have been friends since approximately 1995.  During the relevant period of time, Dolinsky was an executive officer of a private Minnesota corporation that he co-founded in 1997 located in Chaska, Minnesota.  This corporation also provided phone and data wiring services to Zomax.

25.      Defendant Flaherty, age 51, is a resident of Minnetonka, Minnesota.  Flaherty was the CFO of Zomax from January 1997 through October 2001.

26.      Defendant Angelini, age 41, is a resident of Los Altos, California.  Angelini was appointed as the CEO of Zomax on January 31, 2004.  Angelini has been a director of Zomax since January 2000.  From January 2000 through January 2004, Angelini served as the President and COO of Zomax.  From January 1999 to January 2000, Angelini served as the Executive Vice-President of Global Operations of Zomax.  From February 1998 until January 1999, Angelini served as the Vice-President of Western United States and European Operations of Zomax.

**TRUST DEFENDANT**

27.     Defendant Trust is a charitable remainder annuity trust.  On August 17, 2000, Anderson signed the trust agreement.  On August 18, 2000, the Trustee, who was Anderson's personal accountant, signed the trust agreement.  The trust agreement provides that Anderson is the "Donor," names Bedard-Anderson as the "Successor Trustee," and provides that Anderson and Bedard-Anderson are the "Recipients" of an annual annuity payment during their lifetimes equal to 7.57% of the Trust corpus as of the date of the initial funding of the Trust.

**BACKGROUND**

28.     In January 1999, Zomax acquired several manufacturing facilities and call centers in the United States, Canada, Ireland and Germany from a Japanese company.  As a result of this acquisition, Zomax's net sales increased from $61,485,000 in 1998 to $238,698,000 in 1999.  At the end of 1999, Zomax prepared its GM Plan for the year 2000, Zomax's targeted net sales for 2000 was $277,853,000.  Zomax's targeted net sales for the first quarter of 2000 was $58,250,000.  Zomax's targeted net sales for the second quarter of 2000 was $64,031,000.  Zomax's targeted net sales for the third quarter of 2000 was $74,929,000.  Zomax's targeted net sales for the fourth quarter of 2000 was $80,643,000.

29.     As the year 2000 progressed, Defendants Anderson, Bedard-Anderson, Flaherty and Angelini became aware that Zomax was not going to meet its net sales for the third quarter 2000 as projected in the GM Plan.

30.     Starting in late fall of 1999, Zomax's largest customer, a U.S. corporation, communicated to Zomax that it had made strategic business decisions which would result in a decline in orders placed with Zomax.

31.     In the first half of 2000, Zomax continued to solicit its largest customer in hopes of gaining new business and hoped that this customer might alter its decision.  This effort, however, failed.  By the end of June 2000, Zomax and its largest customer finalized its annual contract, which incorporated the customer's decisions to reduce its business with Zomax.  By this time, the customer also made it clear to Zomax that it was not making any further changes to its previous strategic decisions and was not awarding Zomax with additional business to replace the business that Zomax lost.  Zomax did not publicly disclose the loss of any business from its largest customer until its September 21, 2000 public announcement.

32.     The loss of this portion of Zomax's business was material and resulted in an eleven percent reduction to Zomax's revenues from this customer in the third quarter 2000 and a twenty-six percent reduction in the fourth quarter 2000, as compared to the third and fourth quarters of 1999.

33.     In addition to the loss of sales from its largest customer, Zomax also experienced a substantial decline in European sales that began in the first quarter of 2000 and continued through the second quarter of 2000.

34.     On May 10-11, 2000, Zomax held a quarterly general managers meeting.  At this meeting, the general manager from one of Zomax's European facilities informed the Zomax executive group, comprised of Defendants Anderson, Bedard-Anderson, Flaherty and Angelini, that the aggressive revenue growth plan for 2000 was proving difficult to achieve in the first and second quarters of 2000.

35.     On July 17, 2000, a confidential internal report was distributed to the Zomax executive group.  This confidential internal report forecasted third quarter 2000 sales for Zomax of $60,464,000, which was $14,465,000 below the figure originally forecasted by the GM Plan

for the third quarter 2000.  Almost half of this shortfall in sales was attributed to Zomax's

European facilities.  Zomax's third quarter began on July 1, 2000 and ended on September 29,

2000.

36.     From July 25-27, 2000, Zomax held a quarterly general managers meeting, which

was attended by the Zomax executive group.  At this quarterly meeting, the general managers of

Zomax provided the executive group of Zomax with financial statements for the sites that they

managed, revised sales forecasts, and updates on the results of operations.  The majority of the

general managers made oral presentations.  The general managers from Zomax's largest sites

informed the Zomax executive group that Zomax was not going to meet its third quarter 2000

projected sales.

37.     On August 3, 2000, the Zomax executive group received another confidential

internal report.  This report forecasted third quarter 2000 sales for Zomax of $59,904,631, which

was $15,024,369 below the figure originally forecasted by the GM Plan for the third quarter of

2000, and also significantly below the analysts' consensus expectations of $73 million in sales

for the quarter.

38.     Throughout the month of August 2000, Bedard-Anderson personally contacted

the sales representatives and general managers of Zomax to obtain information about the current

and forecasted sales.  Based on her findings, Bedard-Anderson then formulated the September

2000 sales forecast that was used in a confidential internal report.  This report was distributed to

the Zomax executive group on August 31, 2000 and contained the actual sales for July and

August and the September sales forecast formulated by Bedard-Anderson.  These combined

actual and forecasted sales projected third quarter 2000 sales for Zomax of $56,601,853, which

was $18,327,147 below the figure originally forecasted by the GM Plan.

39.    On Thursday, September 21, 2000, at 4:46 p.m. Central Standard Time, Zomax publicly announced that its third quarter 2000 revenues would be $57 to $59 million.  The Company also announced expected diluted earnings of $.15 to $.17 per share, which was substantially below the analysts' earnings expectations of $.28 per share based on the estimate of $73 million in sales for the quarter.  Zomax announced that the shortfall was primarily the result of general market softness and in particular the European market, and a major customer modifying a third quarter product order that Zomax was unable to replace with other business.  On September 21, 2000, Zomax stock closed at $17.38 per share.  The day after the announcement, the closing stock price fell to $8.31 per share, representing a 52% decline in stock price.  After the weekend, on Monday, September 25, 2000, when the market had more time to absorb the information, the closing price of the stock fell to $6.84 per share, representing a 61% decline.

## MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL INFORMATION

40.    On July 24, 2000, during a conference call with analysts, Anderson and Flaherty, on behalf of Zomax, made statements indicating a continued strong demand from their customers and that the second half of the year was going to be extremely busy.  Anderson specifically stated that "we think that we're going to grow in the 20% ballpark for the year, which would indicate that we'll grow in excess of 20% in Q3 and Q4, and, you know, the demand signals that we're seeing from our customers are telling us that as well."  During the same conference call, Anderson and Flaherty omitted to state material facts concerning the decrease of European demand for Zomax's product and the material loss of business from Zomax's largest customer.  Angelini was present for this conference call and remained silent despite Anderson's and Flaherty's false and misleading statements.

41.     In its Form 10-Q for the period ended June 30, 2000 filed with the Commission on August 8, 2000, Zomax again omitted to disclose material facts concerning the decrease of European demand for Zomax's product and the material loss of business from Zomax's largest customer.  Instead, Zomax stated in the Management's Discussion and Analysis (MD&A") section that the demand for CDs and other multimedia consumer products would increase during the fall reflecting increased demand relative to the new school year and holiday season purchases.  The Zomax Form 10-Q explained that this seasonality could result in significant quarterly variations in financial results, with the third and fourth quarters generally being the strongest.

42.     Flaherty prepared the financial statements presented in Zomax's Form 10-Q for the period ended June 30, 2000.  Anderson reviewed the financial statements prepared by Flaherty.  Both Anderson and Flaherty signed Zomax's Form 10-Q for the period ended June 30, 2000.

43.     Zomax's Form 10-Q for the second quarter of 2000 filed with the Commission on August 8, 2000, was materially misleading, incomplete and inaccurate as it did not disclose the decrease of European demand for Zomax's product and the material loss of business from Zomax's largest customer.

### INSIDER TRADING BY ANDERSON, BEDARD-ANDERSON, DOLINSKY AND THE TRUST

44.     Defendants Anderson and Bedard-Anderson were aware of Zomax's policies and prohibitions against insider trading.  Anderson also knew that as an officer and director of Zomax, he was prohibited from providing to others material, nonpublic information about Zomax.  As set forth more fully below, Defendants Anderson and Bedard-Anderson, both directly and through the Trust, repeatedly breached their duty of trust and confidence to Zomax

and its shareholders by selling Zomax stock on the basis of material, nonpublic information concerning Zomax's lower-than-expected third quarter 2000 sales and revenue.

45.     Anderson breached his duty of trust and confidence to Zomax and its shareholders by disclosing material, nonpublic information concerning Zomax to his friend Dolinsky. Dolinsky sold Zomax stock, and tipped his mother to sell her shares of Zomax stock, on the basis of the material, nonpublic information regarding Zomax.  Dolinsky knew that Anderson was an officer and director of Zomax.  Dolinsky knew or should have known that Anderson violated a relationship of trust by relaying information regarding Zomax to Dolinsky.  Moreover, Anderson benefited by disclosing material, nonpublic information to Dolinsky.

46.     The Trust was created by and for the benefit of Anderson and Bedard-Anderson with the intent that the Zomax stock placed into it would be promptly sold for their benefit. Anderson and Bedard-Anderson caused the sale of 465,000 shares of Zomax stock through the Trust, and Anderson substantially assisted on effectuating the liquidation of the stock, on the basis of material, nonpublic information, in breach of Anderson and Bedard-Anderson's fiduciary duty or similar duty of trust and confidence that they owed to Zomax and its shareholders.  Anderson and Bedard-Anderson's knowledge of material, nonpublic information concerning Zomax's lower-than-expected third quarter 2000 revenue and earnings is imputed to the Trust.

**Anderson and Bedard-Anderson's August 2000 Sales of Zomax Stock.**

47.     As of August 1, 2000, Anderson and Bedard-Anderson jointly owned 821,250 shares of Zomax stock.

48.     On August 3, 2000, Anderson and Bedard received a confidential internal report which forecasted that third quarter sales for Zomax would be $15,024,369 below the figure

originally forecasted by Zomax's GM Plan for the third quarter 2000.  On the next day, August 4, 2000, Anderson and Bedard-Anderson began their first wave of sales of Zomax stock. Between August 4, 2000 and August 24, 2000, on the basis of material, nonpublic information concerning Zomax's lower-than-expected third quarter 2000 revenue and earnings, Anderson and Bedard-Anderson sold 356,250 shares of Zomax stock in twenty-seven separate open market transactions.  These transactions occurred in a joint brokerage account held by Anderson and Bedard-Anderson.  Anderson and Bedard-Anderson did not obtain pre-clearance from Zomax's CFO or Zomax's corporate counsel, as required by the Zomax insider trading policy for the sale of these shares of Zomax stock.  In selling Zomax stock in August 2000 prior to the public announcement by Zomax on September 21, 2000, Anderson and Bedard-Anderson avoided losses of $3,886,380.50.

49.     Through the actions alleged above, Anderson and Bedard-Anderson engaged in manipulative and deceptive conduct in the offer and sale and in connection with the sale of securities.  By their conduct in selling Zomax stock, Anderson and Bedard-Anderson breached their fiduciary duty or similar duty of trust and confidence to Zomax and its shareholders not to use confidential information regarding the expected revenue and earnings shortfall for their personal benefit.  At the time of their trades, Anderson and Bedard-Anderson knew, or were reckless in not knowing, that the information they possessed about Zomax's expected revenue and earnings shortfall was confidential and that trading for their own benefit on the basis of that information was a breach of fiduciary duty or similar duty of trust and confidence that they owed to Zomax and its shareholders.

**Creation of the Trust**

50.     On August 17, 2000, Anderson signed the trust agreement to create the Trust.  On August 18, 2000, the Trustee signed the trust agreement to create the Trust.

51.     Anderson selected his accountant to be the Trustee of the Trust based upon their prior personal and working relationship.  Although the Trustee was a certified public accountant, he had limited experience as a trustee and had no experience investing and managing assets in a trust.  Because of the prior business and personal relationship between Anderson and the Trustee, and the Trustee's limited experience as a trustee, Anderson was able to exert control over the Trustee.

52.     The trust agreement provides that Anderson is the "Donor", names Anderson and Bedard-Anderson's personal accountant as the "Trustee", names Bedard-Anderson as the "Successor Trustee", and provides that Anderson and Bedard-Anderson are the "Recipients" of the annual annuity payment.  The trust agreement provides that as Recipients, Anderson and Bedard-Anderson are to be paid an annual annuity totaling 7.57% of the net fair market value of the assets of the Trust, to be divided equally between them, as of the date of the initial funding of the Trust.

53.     At the time of the creation of the Trust, it was the intention of Anderson and Bedard-Anderson to fund the trust with the remaining 465,000 shares of Zomax stock and to liquidate these shares promptly upon their transfer to the Trust.

54.     Anderson substantially participated in the liquidation of the Zomax stock through the Trust.  At the end of August 2000, Anderson sent the Trustee a trust account application to establish a brokerage account for the Trust.  Anderson selected the brokerage firm for the Trust. Anderson and Bedard-Anderson had a pre-existing joint brokerage account at the brokerage firm

selected by Anderson for the Trust.  Anderson filled out by hand most of the requested

information on the trust account application prior to sending the trust account application to the

Trustee.  On August 25, 2000, the Trustee signed the trust account application to establish a

brokerage account for the Trust.

55.     At the end of August 2000, Anderson also provided the Trustee with advice on

techniques that he could use with the brokerage firm for liquidation of the Zomax stock that

would be placed in the Trust account.  One of the techniques recommended by Anderson to the

Trustee for selling the Zomax stock was "working off the tape."  As Anderson described the

practice to the Trustee, "working off the tape" involved quoting a sales price to the Trust's

broker and placing a day order for a fixed amount of stock.  The broker then attempts to sell that

amount of stock at or above the quoted price throughout the day.  The Trustee had never heard of

this practice until Anderson introduced him to it.

**September 2000 Sales of Zomax stock by Anderson, Bedard-Anderson and the Trust**

56.     On September 1, 2000, Anderson and Bedard-Anderson transferred all of their

remaining 465,000 shares of Zomax stock from their joint brokerage account to the new

brokerage account established for the Trust, and began their second wave of sales of Zomax

stock.  September 1, 2000 was outside of the "window" established by Zomax's insider trading

policy for transactions in Zomax stock by company officers and directors.  Furthermore,

Anderson and Bedard-Anderson did not obtain pre-clearance from the Zomax's CFO and

Zomax's corporate counsel for the transfer of these shares of Zomax stock to the Trust.

57.     Anderson and Bedard-Anderson caused the sale of 465,000 shares of Zomax

stock through the Trust, and Anderson substantially assisted on effectuating the liquidation of the

stock, prior to Zomax's September 21, 2000 public announcement.  Anderson and Bedard-

Anderson funded the Trust with Zomax stock knowing that the Trustee would immediately liquidate any Zomax stock transferred to the Trust.  Anderson determined the terms of the Trust, selected the brokerage firm for the Trust, and taught the Trustee how to liquidate the Zomax stock held by the Trust.   From September 6, 2000 through September 20, 2000, the Trustee used the practice that Anderson taught him of "working off the tape" to sell all 465,000 shares of Zomax stock in twenty-seven separate transactions for prices ranging from $16.375 to $19.625. The Trustee sold off the Zomax shares held by the Trust as quickly as possible.  In some instances, the Trustee sold shares below the prevailing market price.

58.     As the sales of Zomax stock held by the Trust progressed, Anderson contacted the Trustee on almost a daily basis. The Trustee kept Anderson informed of the progress of the liquidation of the Zomax stock held by the Trust.  On September 20, 2000, the Trustee sold the last shares of the Zomax stock held by the Trust and notified Anderson that the liquidation was completed.  Anderson had sole discretion in determining the timing of Zomax's public announcement concerning the lower-than-expected third quarter 2000 revenue and earnings.  On September 21, 2000, only after Anderson knew that all of the Zomax stock held by the Trust had been liquidated, Anderson authorized the release of the public announcement concerning Zomax's lower-than-expected third quarter 2000 revenue and earnings.

59.     In selling Zomax stock in September 2000 before the public announcement by Zomax on September 21, 2000, the Trust, Anderson and Bedard-Anderson avoided losses of $5,238,289.

60.     The 465,000 shares of Zomax stock with which the Trust was funded were the only assets placed into the Trust.  Those Zomax shares were valued at $7,978,005.  The $7,978,005 valuation was calculated by using the average of the high price and low price of

Zomax stock on September 1, 2000 and multiplying the average price by 465,000 shares. Based

on this valuation and the terms of the trust agreement, the annual annuity payable by the Trust to

Anderson and Bedard-Anderson is $603,394. Based on the terms of the Trust, Anderson and

Bedard-Anderson will likely receive the vast majority of the Trust's principal and interest

income through the distribution of annuities paid to them during their lifetimes.

61.     On information and belief, Anderson and Bedard-Anderson have already received

payments pursuant to the trust agreement for the last five years totaling approximately $3

million.

62.     Through the actions alleged above, the Trust, Anderson and Bedard-Anderson

engaged in manipulative and deceptive conduct in the offer and sale and in connection with the

sale of securities. By their conduct in selling their remaining Zomax stock through the Trust,

Anderson and Bedard-Anderson breached their fiduciary duty or similar duty of trust and

confidence to Zomax and its shareholders not to use confidential information regarding Zomax's

expected revenue and earnings shortfall for their personal benefit. At the time of their trades,

Anderson and Bedard-Anderson knew, or were reckless in not knowing, that the information

they possessed about Zomax's expected revenue and earnings shortfall was confidential and that

trading for their own benefit on the basis of that information was a breach of fiduciary duty or

similar duty of trust and confidence that they owed to Zomax and its shareholders. The Trust

was created by and for the primary benefit of Anderson and Bedard-Anderson. Anderson and

Bedard-Anderson caused the sale of 465,000 shares of Zomax stock through the Trust, and

Anderson substantially assisted on effectuating the liquidation of the stock. Anderson and

Bedard-Anderson's knowledge of material, nonpublic information concerning Zomax's lower-

than-expected third quarter 2000 revenue and earnings is imputed to the Trust. Therefore, the

Trust breached its fiduciary duty or similar duty of trust and confidence that it owed to Zomax and its shareholders.

**Failure to Report Sales**

63.     As an officer and director of Zomax, and as a beneficiary of the Trust who shared investment control of the Trust with the Trustee, Anderson was required under Section 16(a) of the Exchange Act, and the rules thereunder, to report to the Commission on a Form 4 changes in ownership of Zomax stock held by the Trust.  Despite this requirement, Anderson never disclosed the sales of Zomax stock held by the Trust to the Commission.

**Anderson tipped Dolinsky to Sell Zomax Stock**

64.     Defendants Anderson and Dolinsky have been friends since approximately 1995. During the relevant period of time, Dolinsky was an executive officer of a private Minnesota corporation that he co-founded in 1997 with its headquarters located in Chaska, Minnesota. Anderson loaned money to Dolinsky for the start-up of this corporation.  Anderson invested money in this corporation.  Anderson provided Dolinsky with business advice for this corporation.  This corporation also provided phone and data wiring services to Zomax. Furthermore, Anderson and Dolinsky socialized with each other including dining at restaurants, social events at their homes and sharing a common interest in astronomy.

65.     On July 1997, Dolinsky first invested in Zomax stock for $7.57 per share.  In late winter 1999, Dolinsky advised his mother to purchase Zomax stock.  In early March 1999, both Dolinsky and his mother purchased Zomax stock for prices ranging from $13 to $14 per share. On June 28, 1999, Dolinsky sold all of his shares of Zomax stock for $39.625 per share. Dolinsky's mother sold all of her shares of Zomax stock in two transactions on July 2, 1999 and on August 6, 1999 for prices ranging from $41 to $48.75 per share.

66.     On August 11, 1999, Zomax stock rose to a closing price of $54.00 per share. Effective August 11, 1999, Zomax's board of directors approved a two for one stock split.  On August 12, 1999, Zomax stock closed at $27.87 per share.

67.     On April 17, 2000, Dolinsky once again purchased shares of Zomax stock for prices ranging from $34.375 to $34.75 per share.  On April 25, 2000, Dolinsky purchased additional shares of Zomax stock at $41 per share.  On May 8, 2000, Zomax's board of directors approved a second two for one stock split.  On May 9, 2000, Dolinsky purchased shares of Zomax stock for prices ranging from $17.875 to $18.625.  On June 1, 2000, Dolinsky's mother also purchased shares of Zomax stock at $13.125 per share.

68.     On June 20, 2000, Dolinsky sent Anderson an e-mail stating that he had borrowed heavily to purchase Zomax stock and had margin calls looming over him.  Dolinsky stated that he could meet the margin calls if he sold his shares of Zomax stock, but stated that he "hated to do that."  Dolinsky commented that he had once sold his Zomax stock too soon and that this time he was determined to buy and hold.  In the same e-mail, Dolinsky asked Anderson "if someone you were close to, who didn't own the stock, asked you if it was a reasonable purchase at its current price, would you advise against it?"  On June 21, 2000, Anderson responded to Dolinsky via e-mail stating, "given the market volatility and the unexplained decline in price and selling pressure, if I were to offer advise, [sic] I would probably not advise anyone to buy the stock.…I really don't know if I would advise against it.  I know this isn't much but I hope that it helps with your decision."

69.     During the time of the events alleged in this complaint, Anderson and Dolinsky spoke to each other each month.  In particular, Anderson and Dolinsky spoke to each other during the first weeks of September 2000.  In their conversations, Anderson disclosed to

Dolinsky material, nonpublic information regarding Zomax.  On Friday, September 8, 2000, Dolinsky sold 11,000 shares of Zomax stock at prices ranging from $19.0625 to $19.1875 per share on the basis of that material, nonpublic information provided by Anderson.  Dolinsky also had a long-standing practice of giving investment advice to his mother.  On Sunday, September 10, 2000, Dolinsky placed two telephone calls to his mother.  On Tuesday, September 12, 2000, Dolinsky's mother sold 300 shares of Zomax stock, her entire investment in Zomax.  By selling before the public announcement by Zomax on September 21, 2000, Dolinsky avoided losses of $135,380, and by selling all of her Zomax stock Dolinsky's mother avoided losses of $3,633.

70.     Dolinsky sold Zomax stock when the available public information about Zomax was positive.  For example, on July 24, 2000, Zomax reported that its sales for the six months ended June 2000 increased 16% and its net income increased 106% compared to the same period in 1999.  In the September 4, 2000 issue of Fortune magazine, Fortune ranked Zomax sixth in its listing of the "100 Fastest Growing Companies List for 2000".  On September 7, 2000, analysts recommended Zomax as a "buy" and estimated the 12-month targeted price to be $34.00 per share.

71.     Dolinsky's sale of Zomax stock is inconsistent with his statements to Anderson in Dolinsky's June 20, 2000 e-mail when Dolinsky stated that it was his desire to buy and hold Zomax stock and not sell Zomax stock too early as he had done it the past.

72.     Through the actions alleged above, Dolinsky engaged in manipulative and deceptive conduct in the offer and sale and in connection with the sale of securities.  Anderson breached his duty of trust and confidence to Zomax and its shareholders by disclosing material, nonpublic information concerning Zomax to his friend Dolinsky.  Dolinsky sold Zomax stock, and tipped his mother to sell her shares of Zomax stock, on the basis of the material, nonpublic

information regarding Zomax.  Dolinsky knew that Anderson was an officer and director of

Zomax.  Dolinsky knew or should have known that Anderson violated a relationship of trust by

relaying information regarding Zomax to Dolinsky.  Moreover, Anderson benefited by disclosing

material, nonpublic information to Dolinsky.

**COUNT I**

**Violations of and Aiding and Abetting Violations of Section 13(a)
of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13
[17 CFR 240.12b-20 and 240.13a-13] Promulgated Thereunder**

73.     Plaintiff realleges paragraphs 1 through 43 and incorporates them by reference as

if set forth fully herein.

74.     By reason of the activities alleged in paragraphs 1 through 43 above, Zomax,

aided and abetted by Anderson, Flaherty and Angelini, directly and indirectly 1) filed with the

Commission a quarterly report on Form 10-Q for the second quarter of 2000 that was not in

accordance with such rules and regulations that the Commission has prescribed as necessary and

appropriate in the public interest and for the protection of investors and 2) failed to include in

that report such further material information as was necessary to make the required statements,

in light of the circumstances under which they were made, not misleading.

75.     Anderson and Flaherty knowingly or recklessly and Angelini recklessly  provided

substantial assistance to Zomax in the activities alleged in paragraphs 1 through 43 above.

76.     By reason of the activities alleged in paragraphs 1 through 42 above, Zomax

violated Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13

[17 CFR 240.12b-20 and 240.13a-13] promulgated thereunder.

77.     As a result of the activities alleged in paragraphs 1 through 43 above, Anderson,

Flaherty and Angelini aided and abetted Zomax's violations of Section 13(a) of the Exchange

Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 CFR 240.12b-20 and 240.13a-13] promulgated thereunder.

<strong>COUNT II</strong>

<strong><u>Violations of and Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder</u></strong>

78.     Paragraphs 1 through 43 are realleged and incorporated by reference herein.

79.     By the conduct alleged in paragraphs 1 through 43 above, Zomax, Anderson and Flaherty, in connection with the purchase and sale of securities by the use of the means and instrumentalities of interstate commerce, by the use of the mails, and by the use of the facilities of a national securities exchange, directly and indirectly:  employed devices, schemes, and artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers and sellers of such securities.

80.     Defendants Zomax, Anderson and Flaherty acted with scienter when they engaged in the conduct alleged in Paragraphs 1 through 43 above.

81.     Angelini recklessly provided substantial assistance to Zomax in the activities alleged in paragraphs 1- 43 above.

82.     By reason of the activities alleged in Paragraphs 1 through 43 above, Zomax, Anderson and Flaherty violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

83.     As a result of the activities alleged in paragraphs 1 through 43 above, Angelini aided and abetted Zomax's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## COUNT III

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder

84.     Paragraphs 1 through 72 are realleged and incorporated by reference herein.

85.     By the conduct alleged above, Anderson, Bedard-Anderson, Dolinsky and the Trust, in connection with the purchase and sale of securities by the use of the means and instrumentalities of interstate commerce, by the use of the mails, and by the use of the facilities of a national securities exchange, directly and indirectly:  employed devices, schemes, and artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers and sellers of such securities.

86.     Defendants Anderson, Bedard-Anderson, Dolinsky and the Trust acted with scienter when they engaged in the conduct alleged in Paragraphs 1 through 72 above.

87.     By reason of the activities alleged in Paragraphs 1 through 72 above, Anderson, Bedard-Anderson, Dolinsky and the Trust violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## COUNT IV

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. §77q(a)(1)]

88.     Paragraphs 1 through 72 are realleged and incorporated by reference herein.

89.     By the conduct alleged in paragraphs 1 through 72 above, the Defendants Anderson, Bedard-Anderson, Dolinsky and the Trust, in the offer or sale of securities by the use

of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed devices, schemes or artifices to defraud.

90.     The Defendants Anderson, Bedard-Anderson, Dolinsky and the Trust acted with scienter when they engaged in the conduct alleged in Paragraphs 1 through 72 above.

91.     By reasons of the activities alleged in Paragraphs 1 through 72 above, the Defendants Anderson, Bedard-Anderson, Dolinsky and the Trust violated Section 17(a)(1) of the Securities Act [15 U.S.C. §77q(a)(1)].

## COUNT V

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(2)]

92.     Paragraphs 1 through 72 are realleged and incorporated by reference herein.

93.     By the conduct alleged in paragraphs 1 through 72 above, Defendants Anderson, Bedard-Anderson, Dolinsky and the Trust, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading and engaged in transactions, practices or courses of business which would and did operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

94.     By reasons of the activities alleged in Paragraphs 1 through 72 above, Defendants Anderson, Bedard-Anderson, Dolinsky and the Trust violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§77q(a)(2) and 77 q(a)(3)].

## COUNT VI

### Violations of §16(a) of the Exchange Act [28 U.S.C. §78(p)(a)] and Rules 16a-3

**[17 C.F.R. 240.16a-3] and 16a-8 [17 C.F.R. 240.16a-8] Promulgated Thereunder**

95.     Paragraphs 1 to 72 are realleged and incorporated by reference herein.

96.     As an officer and director of Zomax, and as a beneficiary of the Trust who shared investment control of the Trust with the Trustee, Defendant Anderson was required to file reports of changes of ownership of Zomax stock held by the Trust with the Commission pursuant to Section 16(a) of the Exchange Act and Rules 16a-3 and 16a-8 thereunder.

97.     By the conduct alleged against Anderson in paragraphs 1 through 72 above, Defendant Anderson failed to report changes in the Trust's ownership interests as required by Section 16(a) of the Exchange Act and Rules 16a-3 and 16a-8 thereunder.

98.     By reasons of the activities alleged against Anderson in Paragraphs 1 through 72 above, Defendant Anderson violated Section 16(a) of the Exchange Act and Rules 16a-3 and 16a-8.

## PRAYER FOR RELIEF

**THEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged and alleged herein.

### II.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendant Zomax, its officers, agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the Order of Permanent Injunction, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the

transactions, acts, practices and courses of business described above, or in conduct of similar purport or object, in violation of Sections 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder, and Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§240.12b-20 and 240.13a-13] promulgated thereunder.

## III.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendant Anderson, his officers, agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the Order of Permanent Injunction, by personal service or otherwise, and each of them from, directly or indirectly; (i) engaging in the transactions, acts, practices and courses of business described above, or in conduct of similar purport or object, in violation of Sections 17(a) of the Securities Act [15 U.S.C. §77q(a), Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder, Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rules 16a-3 and 16a-8(b)(3)(i) [17 C.F.R. §§ 240.16a-3 and 240.16a-8] promulgated thereunder; and (ii) aiding or abetting an issuer's violation of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§240.12b-20 and 240.13a-13] promulgated thereunder.

## IV.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendant Flaherty, his officers, agents, servants, employees, attorneys, assigns and all persons in active concert or

participation with them who receive actual notice of the Order of Permanent Injunction, by personal service or otherwise, and each of them from, directly or indirectly; (i) engaging in the transactions, acts, practices and courses of business described above, or in conduct of similar purport or object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder; and (ii) aiding or abetting an issuer's violation of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§240.12b-20 and 240.13a-13] promulgated thereunder.

## V.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendant Angelini, his officers, agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the Order of Permanent Injunction, by personal service or otherwise, and each of them from, directly or indirectly; (i) engaging in the transactions, acts, practices and courses of business described above, or in conduct of similar purport or object, aiding or abetting an issuer's violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]; and (ii) aiding or abetting an issuer's violation of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 [17 C.F.R. §§240.12b-20 and 240.13a-13] promulgated thereunder.

## VI.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants Bedard-Anderson, Dolinsky and the Trust, their officers, agents, servants, employees, attorneys, assigns

and all persons in active concert or participation with them who receive actual notice of the

Order of Permanent Injunction, by personal service or otherwise, and each of them from, directly

or indirectly, engaging in the transactions, acts, practices and courses of business described

above, or in conduct of similar purport or object, in violation of Section 17(a) of the Securities

Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule

10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## VII.

Issue an Order requiring Defendants Zomax, Anderson, Bedard-Anderson Dolinsky, the

Trust, Flaherty and Angelini to pay to the registry of this Court disgorgement of their ill-gotten

gains, together with prejudgment interest thereon.

## VIII.

Issue an Order imposing appropriate civil penalties upon Defendants Anderson, Bedard-

Anderson, Dolinsky and the Trust to pay to the Commission a civil penalty pursuant to Section

21A of the Exchange Act [15 U.S.C. §78u-1].

## IX.

Issue an Order requiring Defendants Zomax, Anderson, Flaherty and Angelini to pay

civil penalties pursuant Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## X.

Issue an Order Anderson and Bedard-Anderson barred from acting as an officer or

director of any issuer whose securities are registered pursuant to Section 12 of the Exchange Act

[15 U.S.C. §78l] pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], as a

result of their violations of Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)] and Rule 10b-5

[17 C.F.R. 240.10b-5] thereunder.

**XI.**

Retain jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered or to entertain any suitable application or motion for additional relief

within the jurisdiction of this Court.

**XII.**

Grant an Order for such further relief as the Court may deem appropriate.

Respectfully submitted,

    s/ Steven J. Levine
Steven J. Levine, IL Bar No. 6226921
levines@sec.gov  (e-mail)
Dee A. O'Hair, OH Bar No. 0063523
o'haird@sec.gov (e-mail)
James G. Lundy, IL Bar No. 6231095
lundyj@sec.gov (e-mail)
Attorneys for Plaintiff
Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:   (312) 353-7398

Dated: June 9, 2005